The next case on for argument is Philpott v. SUNY Good morning, Your Honors. May it please the Court, Daniel Dugan for the appellant Jeffrey Philpott. Jeffrey Philpott, a homosexual male, was the former vice president of student affairs of the State University of New York's College of Optometry. During his time there, during his employment, he was subjected to a severe and pervasive pattern of discrimination, mainly from his direct supervisor, the president of the College of Optometry, David Heath. President Heath routinely made comments that were on their face discriminatory based on points of sexual orientation, impeded his ability to perform his job duties effectively, and ultimately resulted in his termination of employment when he made complaints of that discrimination to multiple members of the SUNY staff, including President David Heath. How does the use of methamphetamine by Mr. Philpott factor into this? I don't think it factors into this analysis. David Heath testified that he had no idea of the methamphetamine use until after the termination of employment, therefore, didn't factor into his decision to terminate Mr. Philpott's employment. He testified that he solely made that decision on his own, with no input from any other faculty or staff, or the director of HR. So when he made that decision, he said he did not know of the... It seems to me a little odd that a director of HR would have some authority over a vice president, which is what your client was. Correct. Well, the HR director here, this is... But they're looking at his ability to perform his work, whether or not he complied with he took leave. That's not in dispute, right? Correct. And whether or not he complied with the conditions under which he was supposed to be taking his leave. Sure. So... Right? Those don't have anything to do with what he's asserting. I'm sorry. I don't think I quite understand your question. If we go back to the performance issues that you stated. Yeah. So the performance issues. Yeah. They are said to arise in the 2014-2015 school year. There is a performance evaluation and this is done by David Heath, the President, with Mr. Philpott in the beginning of September of 2015. This is 45 days prior to his termination. These performance issues, David Heath says he discussed them at that time. There is not a written performance evaluation. He does not let the director of HR know that there are any performance issues. He doesn't let anyone else know there are any performance issues. His declaration that's submitted on this summer judgment motion states that if he does not see improvement throughout the 2015-2016 school year, he may rethink Mr. Philpott's employment with the college. That would be one year later. Instead, on the second day of the evaluation, Mr. Philpott raises to Mr. Heath that he feels like he's being treated differently than other employees based on his sexual orientation. Is it typical for an evaluation to go two days? That seems like an awful long evaluation for if there's not issues. I understood, but there is not a written performance evaluation. Both parties have. There's a question of fact as to what exactly was addressed at that time. Do you know if it's typical or not to go longer than to go two days? I would think it is not typical. However, David Heath determined at that time, whatever performance issues existed were not sufficient to terminate plaintiff's employment. On the second day, plaintiff Mr. Philpott raises the issue directly to David Heath that he feels like he's being discriminated against based on his sexual orientation. And was that the first time he had raised that issue? He had raised it prior to another vice president of the college, Richard Soto. When was that? That was in 2014. Vice President Sotin's response, who under the SUNY policy of discrimination, has a duty to report that to the Title IX officer, which in this case is also the director of HR. He fills both roles. He didn't report it. He said that does not sound like David Heath. You know, deal with it with David Heath, which seems to be a common response from the faculty and staff at SUNY College. Your last point really relates to the retaliation. Yes, it does. Right. And let me just go through. So there's a hostile work environment claim, there's a termination discrimination claim, and then there's a retaliation claim, correct? Correct. The hostile work environment claim, as I understand it, involves a series of comments by Mr. Heath in particular. I think that that's the focus. Correct. Relating to your comments. And there's sporadic, terrible, but would you agree that there's over, what, a four- or five-year period of time? That is correct. And they do all tie in because he then is the, as the discriminating official, as the individual complained of, he then makes the decision to terminate points of support. Right. So your view is that if it's a super — if a comment is made even once by a supervisor who is also in a position to terminate, then that is a hostile work environment? That's sufficient under our case law to constitute a hostile work environment? It exhibits a discriminatory animus. No, no, no, no, no, no. I'm talking about the hostile work environment. So is that enough? A few — one, one or two comments over a four- or five-year period by a supervisor who is also in a position to terminate, is that enough to create a hostile work environment under our case law? I believe that is severe and pervasive, and I feel — and I believe that we cite it to more than one or two. So that's — that constitutes pervasive as opposed to severe? Yeah. And that's severe because he is the same individual that can impede — What is your best case for that? And I, you know — Right. If that were our case law, that would be great, but I don't know that — I think we've rejected that view. So that's the hostile work environment. On the pervasiveness. Pervasiveness. Correct. This was throughout the employment of the plaintiff. Yeah, but we — We've repeated it multiple times. We've done it in different forums. We've rejected the view that a few sporadic comments over an extended period of time — I don't like this, but this is what we — what our case law is — can constitute a hostile work environment. Understood. And I believe the record and the facts in this case show that it was more often than sporadic, that it occurred each time he publicly spoke in front of other individuals. You agree that if it were sporadic, the hostile work environment claim would fail? Under the case law, yes. All right. And then with respect to termination, so just to pick up on what I think Judge Hall was asking you about, there were work performance issues identified. Correct. In a letter from Mr. Heath, or I don't know if it was a letter or — there were texts and e-mails and letters, but — Correct. Every performance issue cited occurred prior to that September performance evaluation. David Heath at that time determined they were not enough to terminate plaintiff's employment. There's not one performance issue cited in that 45-day period between when he first complained to David Heath at that performance evaluation. It says that your work performance was subpar. Why isn't that enough to terminate? David Heath himself, the President, determined at that time it was not sufficient to terminate his employment, that he was going to rethink it over the course of the next year. The question is, what changed in those 45 days? Well, does something have to change, or does there just have to be a rethinking? I said, well, now that I'm thinking about it and looking at all of this, I have changed my mind. Right. And that rethinking lends itself to the inference of discrimination retaliation here. Because — David Heath became aware on that — on the Sunday when he decided on his own that he was going to terminate plaintiff's employment, he became — He became aware of what? He became aware through a text message from plaintiff that plaintiff had gone to Doug Shading, the director of HR, in his capacity as a Title IX officer. Plaintiff had already put him on notice at that September meeting that he was complaining of sexual orientation directly to David Heath. Now David Heath knew that he had gone to the director of HR that — in the previous days when he asked for leave, in his capacity as a Title IX officer. He knew the complaint was coming. He knew the complaint was made. And what did he do? He said he decided on his own at that time that plaintiff's employment needed to be terminated. Was there not — well, look, I think this is why I was trying to analytically separate out the three issues, and you're — you're, it seems to me, conflating the termination issue and the retaliation issue by saying that Mr. Heath identified these — and others, he was not alone — identified these work performance issues, but it was only when this text was transmitted from your client to Mr. Heath that he made a decision. That's a — that's part of the retaliation claim, is it not? That's correct. So the focus of — the real focus of your argument is on retaliation. Yes. That is the argument I'm making right now, yes. All right. Thank you. I'll reserve the rest of it. And you have three minutes, Mr. Duggan. Thank you. When you stand up again. Mr. Parker. May it please the Court. I'm Josh Parker, counsel for SUNY. The district court properly granted SUNY's summary judgment because no reasonable trier of fact could find, A, that the college created a hostile work environment based on sexual orientation, B, that the college terminated Philpott's employment because he was gay, or C, that SUNY unlawfully retaliated against Philpott. Can you focus on the retaliation claim, given what your friend just said? Sure. So SUNY conceded below and is not disputing here that Philpott established a prima facie claim of retaliation given the temporal proximity between the complaint and his termination. But as this Court said in El Sayed on page 48 of our briefs, temporal proximity is not sufficient to establish pretext without more. And here, and this also goes to discriminatory termination, the legitimate reasons for terminating Philpott's employment were not pretext for retaliation. And you marshaled those for me, please. Sure. I am — I think a helpful way to do it, given that Philpott emphasizes that there wasn't a written evaluation, is to go through what Philpott actually admitted in his deposition in 56.1 admissions with respect to performance deficiencies. So let me start with the deposition admission that Philpott admitted that in 2014 and 2015, he probably did not come into the office until 1 p.m. multiple times, worked from home more often, and was questioned about his poor attendance by multiple administrators. That's at page 28 and 29 of the supplemental appendix. He also admitted that he didn't finish the AAUJ feasibility report. This was a report he was supposed to — he and a partnership with the Arab American University in Jenin. There was a contractual — There was a contractual deadline, and he had to renegotiate that deadline and defy Dr. Heath's expectations. That's on — he admits that on page 30 and 34 of the supplemental appendix. He also admitted in his deposition that he failed to timely complete revisions to the Student Code of Conduct before the 2015 academic year. There is contemporaneous evidence showing that there was — there are minutes in the record showing that there was a deadline to get a draft to Heath by May 2015 so Heath can review it, others could review it, and it could be published ahead of the academic year. It was not finished until after the academic year started. Were these performance issues raised with Mr. Philpott prior to his complaining about discriminatory conduct? Yes. So there was a — as Your Honor pointed out, there was a two-day evaluation, seven hours, but between the two days. And in the first day, these issues were raised. There might have been additional issues raised in the second day, but Philpott's testimony is after all that. We don't have any document or evidence of this. We have — there's no written review documenting these issues that you're describing now? There is no written performance evaluation, and of course, that would be ideal. But we're at summary judgment right now, and we have not only deposition admissions — Just curious, is that typical, that there's no written evaluation provided, especially when there's negative performance issues? I don't think it's typical anymore. But I can't — I can't give you a comprehensive answer to how typical that was in the past. But in addition to the deposition and 56.1 submissions, we have contemporaneous evidence of Dr. Heath through e-mails and texts and other documentation showing that Philpott — his dissatisfaction with Philpott. So let's take the example in December 2014 and January 2015 on two matters of the college. In e-mails, Dr. — Dr. Heath expressly tells Philpott, do not contact this third party. I will handle it. Philpott defies those instructions, contacts the third parties, and then Heath tells him, you know, we should meet to discuss this. This was a problem. I advise you not to do that. That's at page 204, 205, and 198 and 199 of the supplemental appendix. You could see those e-mails. You also see panicked e-mails from a director of a French optical institute, because let me just briefly explain what happened here. There was a summer exchange program between the College of Optometry and the French Optical Institute. And Dr. Heath directed Philpott in fall 2014 to tell the director, we're not going to be holding this summer exchange program anymore. He never did. Philpott — well, not he never did. He told her, but not until the spring. So then the director sends a panicked e-mail to Dr. Heath saying, I already enrolled students in this program. And so they had to rush to get faculty in order to staff this program. And Dr. Heath then instructed Philpott to inform her, OK, we're going to host the program after all. He never did. And so she sends another panicked e-mail to Dr. Heath. And one of your honors asked, you know, how does Philpott's crystal meth addiction work into all of this? What's relevant is not when or whether Dr. Heath knew about the meth addiction. What's relevant is there is a clear explanation for the decline in this behavior, which is Philpott admitted in his deposition he started using in April 2013 and was addicted by the end of 2013. This was following a breakup with his long-term partner. And that's when these performance issues start. The last point I will raise is that you have to consider, especially for hostile work environment, but also for all three claims, the context in which these assertedly discriminatory statements are being made. Before Philpott started work, Dr. Heath knew that he was gay and that he had a partner. He took out, they went to dinner and Philpott admitted in his deposition that that dinner was hospitable. Just to go back, because I think you've been addressing the termination issue. How long prior to this text, I take it, on October 18, 2015, had these work performance issues been identified? The earliest issues would have been in the 2013-2014 school year. For two, for a couple of years, and then they, as I understand it, intensified prior to the termination about maybe a month and a half or two months. Is that fair? Yes. So what I think is going on, just again to focus on the retaliation claim, is that there is a, I guess a text. Is that what an iPhone message is? A text on October 18, 2015, where he says, I'm sorry that I can't, to Mr. Heath, I'm sorry that I can't be more white or smart or straight. And within a very, very short time, a day, two, two days, is he terminated? He sent a letter, I believe, on October 21. Okay. So within a very short time of that text message, which one juror might reasonably construe as yet another complaint, he's terminated. So, and look, I will just, I'm inclined to agree with you that termination, in the absence maybe of this, seems to have been justified, or at least that does not seem to have been a showing of pretext. But explain to me why a reasonable juror couldn't view those last few days, the developments in the last few days, as a form of retaliation, even though, yeah, this guy's a terrible worker because of meth, for whatever reason, and he's screwed up. But you've known, Sunni, that he was a screw-up, for lack of a better word, for years. And it intensified months before, but it's just when a particular complaint is made to a particular supervisor, that that supervisor determines he's got to go. Let me try to answer that. I think it helps to look at the context from September to October 2015. Clearly, Dr. Heath is assessing these performance issues and assessing kind of termination decisions annually when he does these performance evaluations. So the accusation first occurs in September 2, 2015, the second day of the performance evaluation. And in that evaluation, he offers Philpott an opportunity to potentially improve his behavior. He says, look, maybe we could do 360 evaluations where your employees give you feedback and we work with you in order to improve your performance. He rejects that. So he's already thinking, okay, this likely isn't going well. But, you know, he's really trying to bend over the edge, and this is consistent with his behavior previously when he helped him finish the AAUJ report. And then in October, before this October 18 text, remember what precipitated all of this, which is on October 15th, he had a 10 a.m. meeting with Dr. Heath and another administrator, Philpott, did. And Philpott doesn't show up for that meeting at all, doesn't call Dr. Heath, and emails Shading after that meeting occurred. So at that point, Heath has said in his deposition that that upset him. He had a meeting planned. That is probably the closest thing that probably precipitated. But I want to also emphasize that what really immediately precipitated him to move from, okay, we're going to give this a few more months to this isn't sustainable, is not the fact that he complained about sexual orientation discrimination. He already he told Heath September 2, Heath told him to go to Shading then. It's that he engaged in hostile email communications with the director of HR. This is what Heath says in his declaration, and let me just read you some of them from the record. They're pretty short. This is after October 15th. There's dialogue. Philpott won't specify the form of leave that he's taking. And these are some of the things he says to Shading before October 18th. How can I trust you? That's on page 187.4 of the Supplemental Appendix. He accuses Shading of going around and making comments about me being AWOL at page 187.6, and he accuses him of doing one of the most insidious, disgusting treatments of a human being I've ever heard of in my life. Can't believe it's happening to me when I meet every girl. Breyer. In the termination letter, did Mr. Heath identify the tone of these emails as a reason for terminating him? Yes, he says. Well, he speaks broadly. The termination letter says his performance issues and the degradation of his professional relationships, and this is entirely consistent. Dr. Heath received reports and then personally observed tension between his — him and his subordinates, and subordinates were talking about getting other work. So this is part and parcel of the same issues that were occurring. And I just want to emphasize — yeah. You're making a terrific jury submission. The concern is that you may well be right. The argument is there, but it also sounds like, at least with respect to this very discrete issue, and I understand that we've got the case law that usually, as you put it, temporal proximity is not enough, a jury could view the fact that this renewed complaint based on sexual orientation or about sexual orientation discrimination is what finally triggered the termination, even though it was a well-justified termination. Let me add one different response to that, because I really don't think there's anything more than temporal proximity. And something that emphasizes that is he didn't actually file a complaint. SUNY's procedure says we strongly prefer and advise you to file written complaints. A written complaint was emailed to him by SUNY's chief counsel on October 21st, 2015. He was given an e-mail address and said, look, fill it out, send it to her. Never filled it out. Shading in an October 2018 e-mail, I could give you the appendix cite on that. In October 2018 — Breyer. You are not arguing, Mr. Parker, that if an employee, for whatever reason, does not invoke the formal complaint procedures of his or her employer, and rather complains directly about some underlying form of discrimination, it's clear that they can be terminated based on that? SUNY. Absolutely not. I'm just saying the timing — there's been the suggestion on October 18th or 19th that there was some formal — there was some complaint filed, and I'm just saying that that is not actually what the record shows. Breyer. Yeah, but would you agree that a jury might view that as — reasonably as a form of complaint? Another — yet another complaint about sexual orientation and — no? SUNY. Yes. Breyer. It — SUNY. Maybe so? Breyer. Yeah, no. I think that's certainly possible, but this is no different in kind than the stream of e-mails and text messages that were coming in the month prior. So I don't view it as a distinct date where there was action taken, this is the first time this happened, and then he complains that — in fact, he testified in his deposition that in April 2015, he also mentioned — Philpott also mentioned sexual orientation discrimination. I just think — I'm pretty sure Elside's a summary judgment case. We do — we absolutely do have temporal proximity here, but I really don't think we have anything more, and I just don't think under this Court's case law that that suffices. Unless the panel has further questions, I urge an affirmance. Roberts. Thank you, Mr. Parker. Mr. Duggan. Duggan. Thank you, Your Honors. Just touching on whether there is more than temporal proximity, our position is that there is, just in the sequence of events that occur, Mr. Philpott makes his leave request to Doug Shading in his role as a Title IX officer. He doesn't make it directly to David Heath. It wasn't actually a policy that he make it to David Heath. David Heath simply expressed, well, no one had not asked him directly previously. There was a reason why he didn't hear, and that's because he was complaining  Alito. When you say that there's more than temporal proximity, and then you start to refer to the sequence of events, that seems to be a form of temporal proximity. So what else is there besides the sequence of events? Duggan. Sure. I'll get right to it. So Doug Shading, at the direction of David Heath, is told that he can make a decision on plaintiff's leave. Okay? That — that Philpott made it clear to Shading that he didn't want to deal with David Heath. David Heath said, okay, that's fine, Mr. Shading, you can make that decision. So he grants the two-week leave. It is only after that two-week leave is granted — so plaintiff is out on leave at this point — that David Heath gets that text message at, I believe, it's 1107 a.m. on Sunday morning. He said he then drives back from a conference upstate. It's only after he gets that text message — text message — is the subject of a complaint to HR that he overrides that leave decision, changes his mind, and says — calls Doug Shading and says, I'm terminating plaintiff's employment because of — How is that different from an argument based on temporal proximity? Because you have the discriminating official that's being complained of now overriding the decision of the director of human resources who accepted that complaint, and says we're now terminating his employment based on performance and interpersonal issues. Doug Shading accepted that and wrote a letter, signed off on it, and sent the termination letter to Mr. Philpott based on those issues. He had no personal knowledge, he testified to, that he had no personal knowledge of any performance issues. He'd never received a complaint from anyone else. Roberts. Shadings. Shading had, the director of HR. Yet he let the discriminating official tell him what to write in that letter, and he sent it to Mr. Philpott. Of course, Mr. Philpott didn't follow up with a written complaint, which under the policy he had 180 days to do. And let me backtrack. The initial contact for initiating a complaint to a Title IX officer can occur by phone, telephone — excuse me — telephone, email, or in person, which is what occurred. Yes, a formal complaint form was eventually sent. Mr. Philpott was terminated prior to an opportunity to fill that out and submitted. There was no investigation that occurred. Let me just reiterate. Just what precisely, again, just so I have it in mind, not that I'm not aware of it, but is the triggering event? What's the complaint that leads to the retaliation? The complaint that was — Oh, sorry. What is it that Mr. Philpott said to whom that — to the President or to who? I'll go through them. So let me just address — there was one point made. He did make a complaint of discrimination prior to any performance issues being raised. There was a complaint of discrimination made to a fellow Vice President, Soden, which I mentioned previously. In 2014, that's confirmed in Dr. Soden's deposition transcript. So it's not only raised in September. In September, he raises it directly to David Heath. Then, on October 15th, he emails the Director of HR, Title IX Officer Doug Schading, says, Complaining of sexual orientation discrimination is not in dispute. Thereafter, he's granted that two-week leave, which Heath allows, but then Heath becomes aware through that text message that he had complained of it. Thank you, Your Honors. Thank you. Thank you both. We'll reserve decision in this case.